UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> v. <br><br> **PAMELA PORTER,** <br><br> Defendant. | **Crim. Case No. 25-59-TSC** |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

Pamela Porter conspired with a detainee—Inmate-1—at the D.C. Correctional Treatment Facility ("CTF") and a D.C. Department of Corrections ("DOC") employee to smuggle contraband into CTF. She paid bribes to the DOC employee so that he would violate his duties and bring dangerous contraband, including controlled substances, to Inmate-1. Additionally, Ms. Porter received money from various detainees to whom Inamte-1 sold the contraband inside CTF. An audit of the D.C. Jail during the period of Ms. Porter's offense found the rate of overdose deaths at the facilities to be 10 times the national average at U.S. jails. Ex. 1. During the audit period, there were also 76 incidents of contraband drugs recovered and Narcan was administered 148 times. *Id*. These numbers are shocking and underscore the seriousness of Ms. Porter's actions. Nevertheless, Ms. Porter was quick to accept responsibility and was open and honest with investigators about her role in the offense. In consideration of the factors set forth in 18 U.S.C. § 3553(a), a sentence at the bottom of the applicable guidelines range is appropriate, which if this Court adopts the Government and Probation's calculation, is 6 months incarceration and 6 months of home detention. Such a sentence would be sufficient but not greater than necessary to achieve the purposes of sentencing.

1

I.  **Background**

CTF is a correctional institution operated by the DOC. CTF is located adjacent to its sister facility, the Central Detention Facility (CDF), a second correctional institution operated by the DOC. CDF is used to house adult male detainees awaiting trial, serving a misdemeanor sentence, or in transit to a Bureau of Prisons facility. CTF is a specialized medium security penal institution that houses inmates requiring specialized medical treatment or treatment and monitoring related to substance dependencies.

The D1A housing unit at CTF houses detainees who are 50 years or older. From December 19, 2022, through September 23, 2024, Herbert Baylor was a case manager employed by DOC to assist and manage resident detainees at CTF, to include Inmate-1. Baylor had an office at CTF located on the D1A men's housing unit that contained, among other things, a computer and office phone provided by DOC to Baylor for Baylor's use in carrying out his assigned duties. As a DOC employee, Mr. Baylor was governed by the DOC Contraband Control Policy, which indicates that trafficking contraband of any kind to inmates is strictly prohibited.

In July 2024, investigators received information regarding a contraband smuggling ring, involving Mr. Baylor, Inmate-1, and a confidant of Inmate-1—Ms. Porter. *See* Sealed Ex. 2. Specifically, investigators learned that Inmate-1 would direct Ms. Porter over the phone to discretely fit contraband into a cigarette carton. *Id*. Ms. Porter would give the cigarette carton containing contraband to Mr. Baylor to smuggle into CTF. *Id*. Mr. Baylor would then smuggle the contraband into CTF and deliver it to Inmate-1 in exchange for payment, using either cash or a peer-to-peer payment application such as CashApp. *Id*. Inmate-1 would then sell the contraband to other detainees. *Id*. The contraband included Xanax, "fake Percocets," suboxone strips, crack-cocaine, and synthetic marijuana. *Id*. Investigators were informed about a specific incident in

Spring 2024 where a significant number of pills were inside of a cigarette carton brought by Mr. Baylor to Inmate-1. *Id*.

Investigators set out to corroborate this information. Phone records obtained from Mr. Baylor's office phone showed 106 calls between that phone and Ms. Porter's phone between January 5, 2024, and June 21, 2024. Phone records from Mr. Baylor's cell phone showed 20 calls or text messages between Baylor's cell and Ms. Porter's phone between January 16, 2024, and June 18, 2024.

Records from CashApp showed that Ms. Porter paid Mr. Baylor $1,200 via CashApp 1 between February 3, 2024 and June 21, 2024.

| Date | Status | Total | Subject | Sender | Action | Recipient |
|---|---|---|---|---|---|---|
| 2024-06-21 13:14:07 UTC | PAID_OUT | USD 300.00 | | Pamela Porter | Paying | Herbert |
| 2024-06-11 13:44:12 UTC | PAID_OUT | USD 50.00 | | Pamela Porter | Paying | Herbert |
| 2024-06-10 23:07:52 UTC | PAID_OUT | USD 150.00 | | Pamela Porter | Paying | Herbert |
| 2024-06-10 23:00:54 UTC | DECLINED | USD 150.00 | | Pamela Porter | Paying | Herbert |
| 2024-06-10 23:00:07 UTC | EXPIRED_WAITING_ON_SENDER | USD 150.00 | | Pamela Porter | Paying | Herbert |
| 2024-06-05 20:22:26 UTC | PAID_OUT | USD 200.00 | | Pamela Porter | Paying | Herbert |
| 2024-05-30 18:39:10 UTC | PAID_OUT | USD 150.00 | | Pamela Porter | Paying | Herbert |
| 2024-02-07 16:26:49 UTC | PAID_OUT | USD 200.00 | Thank you | Pamela Porter | Paying | Herbert |
| 2024-02-03 04:35:04 UTC | PAID_OUT | USD 150.00 | Thanks | Pamela Porter | Paying | Herbert |

Additional payments were made to Mr. Baylor from a family member of Inmate-1. Contemporaneous with payments to Mr. Baylor by Ms. Porter and Inmate-1's family member were

3

payments from other detainees or their representatives to Ms. Porter and Inmate-1's family member, suggesting that the contraband was trafficked once inside the facility.

For the seven identified CashApp payments from Ms. Porter to Mr. Baylor, completed calls between Mr. Baylor's phone and Ms. Porter were observed on the same day, the day before, and/or the day after a payment was made. For example, on June 5, 2024, $200 was sent from Ms. Porter to Mr. Baylor within two minutes of a call. On June 21, 2024, $300 was sent from Ms. Porter to Mr. Baylor within twenty minutes of a call.

The financial evidence also suggested that Ms. Porter personally benefited from the scheme. For example, on February 7, 2024, Ms. Porter paid Mr. Baylor $200. On that same day, Porter received $1,100 from another detainee at CTF. That detainee is known to DOC to have substance abuse problems. Of that $1,100, Ms. Porter paid $500 to a family member of Inmate-1 and transferred the remaining $600 to her personal debit card.

On September 26, 2024, Ms. Porter was served a target letter and interviewed by investigators. She admitted to the scheme described above. Shortly thereafter, Ms. Porter indicated that she wanted to accept responsibility for the offense. She acknowledged paying Mr. Baylor via CashApp at the direction of Inmate-1. She acknowledged two specific occasions when she brought contraband to Mr. Baylor to smuggle into CTF for Inmate-1 in exchange for payment. She was aware that Inmate-1 would then sell the contraband to other detainees.

## II.     Sentencing Guidelines

The following guidelines provisions are not in dispute by the parties or the presentence report writer:

| Guideline | Description | Offense Level |
|---|---|---|
| § 2C1.1(a)(2) | Base Offense Level | +12 |
| § 2C1.1(b)(1) | More than one bribe | +2 |
| § 3E1.1(a) | Acceptance of Responsibility | -2 |

| § 4C1.1 | Adjustment for Zero-Point Offender | -2 |
|---|---|---|
| **Total** | | 10 |

PSR ¶¶ 25-27, 33-35. However, the parties disagree over whether an upward adjustment of four levels is appropriate pursuant to U.S.S.G. § 2C1.1(b)(3). The Government and the presentence report writer believe Mr. Baylor qualifies as a "public official in a high-level decision-making or sensitive position," while the defense does not. If Mr. Baylor is found to hold a high-level decision-making or sensitive position, the offense level is 13 and the applicable guidelines range is 12 to 18 months. If he did not hold such a position, the applicable guidelines range is 6 to 12 months.

<u>Mr. Baylor held a "sensitive position."</u>

Under U.S.S.G. § 2C1.1(b)(3), a four-level increase applies if the offense involves "any public official in a high-level decision-making or sensitive position." U.S.S.G. § 2C1.1(b)(3). The Guidelines commentary defines "high-level decision making or sensitive position" as "a position characterized by a direct authority to make decisions for . . . [a] government entity, or by a substantial influence over the decision-making process." U.S.S.G. § 2C1.1 cmt. n.4(B).

Courts have regularly held that correctional officers occupy sensitive positions because they "directly and significantly influence inmates' lives and the entire facility's safety with the decisions they make." *United States v. Guzman*, 383 Fed. Appx. 493, 494–95 (5th Cir. 2010); *see also United States v. Dodd*, 770 F.3d 306, 313 (4th Cir. 2014); *United States v. Grosso*, 658 Fed. Appx. 43, 46–47 (3d Cir. 2016). Further, correctional officers who accept bribes to bring contraband to prisoners endanger those inside and outside of the prison—thereby affecting their lives. *United States v. Love*, 710 F. Appx 351, 353 (11th Cir. 2017).

Importantly, courts have clarified that supervisory authority is not a prerequisite. Individuals in non-supervisory positions may also fall within the definition of "sensitive" if they

5

possess meaningful discretion or authority in carrying out their duties. *See United States v. Zamora*, 982 F.3d 1080, 1085 (7th Cir. 2020) (upholding the enhancement where a low-level correctional officer, without supervisory authority, accepted bribes in exchange for smuggling contraband). The Seventh Circuit emphasized an employee's power and influence over inmates and capacity to use that authority for corrupt purposes is significant to considering whether they occupy a sensitive position under U.S.S.G. § 2C1.1(b)(3). *Id.*

As the Third Circuit explained in *Grosso*, corrections officers "wield[] the coercive power of the state to maintain order and safety among the populations [they] protect." 658 Fed. Appx. at 46–47 (internal quotation marks omitted). In *McCowan*, the court likewise upheld a four-level enhancement for a correction officer who accepted bribes to smuggle drugs, reiterating that by virtue of his position, the officer could "directly and significantly influence inmates' lives." *United States v. McCowan*, 464 Fed. Appx. 213, 216 (5th Cir. 2010).

By much of the same logic, a DOC case manager holds a sensitive position. Attached to this filing, the Court will find the job description for a case manager, along with the report from an interview with Mr. Baylor's former supervisor. Exs. 3 & 4. According to the job description, case managers "implement[] a planned program of institutional activities designed to meet the varied demands, individual needs, and abilities of an assigned caseload of inmates." Ex. 3 at 1. Practically speaking, Mr. Baylor's supervisor described caseworkers as an "advocate for inmates." Ex. 4 at 1. They conduct risk and need assessments for their assigned inmates and serve as liaisons between the inmates and other departments in DOC, as well as the community. Ex. 3 at 2. Additionally, they assist in determining the classification level of inmates and are responsible for re-evaluating inmates every 90 days. *Id.*

Here, the Fourth Circuit's reasoning in *Dodd* is instructive because the court held that correctional officers occupy a sensitive position, warranting the § 2C1.1(b)(3) enhancement, due to the inherent trust placed in them and the potential danger created when that trust is abused. *Dodd*, 770 F.3d at 312. In this case, Mr. Baylor, as a case manager, held a position of comparable sensitivity and trust. His contacts with inmates were designed, according to the official job description, to resolve problems and "motivate and/or influence" inmates. Ex. 3 at 4. Case managers also prepare reports based on observed behavior and compliance with facility rules which influence institutional decisions. As noted explicitly in the job description, a case manager's recommendations and decision "have the potential for serious impact on the inmate." Ex. 3 at 4. And as noted by Mr. Baylor's supervisor, case managers opinions carry weight, and they are considered "positions of authority" at DOC.

This capacity to influence inmate outcomes places case managers squarely within the category of individuals occupying sensitive positions. Mr. Baylor's acceptance of bribes from an inmate demonstrates the very risk the enhancement is designed to address: a public official using their trusted position to subvert institutional order and security. As in *McCowan*, where the court referenced even the influence held even by an administrative aide, Mr. Baylor's ability to affect the lives and classifications of inmates is sufficient to trigger the enhancement. *See McCowan*, 464 Fed. Appx. at 216.

In sum, because Mr. Baylor held a position of trust within a correctional facility, possessed discretionary authority over inmates, and used that position to accept bribes, the four-level enhancement under U.S.S.G. § 2C1.1(b)(3) should be applied.

### III. The 18 U.S.C. § 3553(a) Factors

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the guidelines, any relevant policy statements, and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(1)-(6).

Here, the factors weigh in favor of a guidelines sentence.

#### A. The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense

Ms. Porter's actions were undoubtedly serious. She was an integral part of both a bribery and contraband smuggling scheme. Furthermore, she assisted Inmate-1 with his drug distribution inside CTF by accepting payment from other detainees and making bribe payments to Mr. Baylor. On at least two occasions, she delivered the contraband to Mr. Baylor herself.

For controlled substances to enter DOC facilities, detainees must necessarily rely on DOC employees or civilian conduits outside the facility. As recognized by the recent audit of the D.C. jail, the flow of contraband into DOC facilities is a significant problem, and the consequences can be lethal. Inmate-1 could not have distributed drugs within DOC facilities without Ms. Porter or someone else like her. That Ms. Porter was willing to bribe a public official and assist in both the smuggling of drugs into CTF and the distribution of drugs once inside for moderate financial gain is highly alarming. And the frequency of overdoses at the jail highlights the recklessness of Ms. Porter actions.

This factor favors a guideline sentence.

### B. The Need to Promote Respect for the Law and to Deter the Defendant and Others from This Type of Criminal Conduct

There's little in Ms. Porter's background suggesting that she is a high risk to reoffend. However, Ms. Porter is one of a growing number of associates of DOC detainees who assist the detainee in obtaining contraband. *See United States v. Roper et al.*, 24-CR-520; *United States v. Bell*, 25-MJ-106. The goals of general deterrence are served by a guidelines sentence in this case.

### C. The History and Circumstances of the Defendant

At 56 years old, Ms. Porter has no prior criminal history, and the PSR does not identify any contacts with law enforcement prior to this offense. She has been a productive member of the workforce and is a supportive mother to four children. Ms. Porter readily accepted responsibility for her actions, which she attributes to being in a difficult financial situation. Her financial struggles, while no justification for the offense, appear to be corroborated by the PSR, which identifies a steep reduction in income in 2023. PSR ¶ 66–68. Ms. Porter also references Inmate-1 being manipulative—a fact supported by both Inmate-1's criminal history and evidence collected in this investigation. Ultimately, this factor favors a sentence at the bottom of the guidelines range.

### D. Unwarranted Sentencing Disparities

The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008); *see also United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second."). The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which

those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533.

A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

According to the U.S. Sentencing Commission's Judiciary Sentencing Information, "there were 70 defendants whose primary guideline was §2C1.1, with a Final Offense Level of 13 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure." PSR ¶ 106. Only twenty-seven percent of those defendants did not receive any period of incarceration. "For the 44 defendants (63%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 6 month(s) and the median length of imprisonment imposed was 6 month(s)." PSR ¶ 106. As such, the Government's request is in line with the average and median sentences in these types of cases and will not create a sentencing disparity.

## CONCLUSION

The seriousness of Ms. Porter's actions—bribing a public official and aiding and abetting the smuggling of contraband and the distribution of controlled substances—warrants a guidelines sentence. The mitigating factors such as Ms. Porter's acceptance of responsibility, her productive employment history, her lack of criminal history, and the manipulative nature of Inmate-1 suggest that a sentence at the bottom of the respective guidelines range is sufficient, but not greater than necessary, to serve the purpose of sentencing. The Government therefore requests a sentence at

the bottom of the applicable guidelines range, which the Government calculates to be 6 months incarceration, coupled with 6 months of home detention.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY


 /s/ *Joshua Gold*
Joshua Gold
Tx Bar No. 24103101
Assistant United States Attorney
United States Attorney's Office for D.C.
601 D Street NW,
Washington, D.C. 20530
E-mail: Joshua.Gold@usdoj.gov
Telephone: (202) 815-8965